## Case No. 2,989.

COLE SILVER MIN. CO. v. VIRGINIA & GOLD HILL WATER CO. et al.

[1 Sawy. 470.][1]

Circuit Court, D. Nevada. Feb. 13, 1871.

PARTIES TO BILL BEFORE SERVICE — EFFECT OF OMISSION ON JURISDICTION — JOINT TRESPASSER OMITTED—AMENDMENT—INJUNCTION—INCAPACITY OF CORPORATION NO DEFENSE TO TRESPASS— WRONGFUL DIVERSION OF WATER—PRELIMINARY MANDATORY INJUNCTION.

1. A person residing out of the jurisdiction of the court, though named as defendant in a bill,

is, substantially, not a party to the action, till service of process or appearance.

2. Whenever the making of a person a party to a bill would oust the jurisdiction of the court, as to other parties, such person, if not an indispensable party, may be omitted, for the purpose of exercising jurisdiction, as to other parties, whose rights can be determined without his presence.

3. In an action to restrain the diversion of water by tort-feasors, one of the tort-feasors, who resides out of the jurisdiction of the court, may be omitted.

4. The court may permit an amendment to a bill, by omitting a non-resident, named thereon as defendant, but not served, without prejudice to a motion for injunction.

5. In an action by a corporation for injuries to property in its possession, the court will not, at the instance of the wrong-doers, enter into any inquiry as to the legal capacity of such corporation to hold the property.

[Cited in Southern Pac. R. Co. v. Orton, 32 Fed. 470.]

6. Plaintiff, in excavating a tunnel in a mountain to its mining claim, on the public lands of the United States, struck a subterranean flow of water, which it appropriated and enjoyed for several years. Defendants ran a tunnel from a distant point into the mountain, to a point some thirty feet in altitude, directly below the point where the plaintiff obtained the said water; and, thereupon, the water, which before flowed through plaintiff's tunnel, was intercepted and discharged through defendants' tunnel, and by them appropriated to their own use. *Held*, that said diversion and appropriation of the water was wrongful, and that complainant was entitled to an injunction.

7. Where defendants, by means of a tunnel run into a mountain at a lower altitude than complainant's tunnel, wrongfully intercept water appropriated by complainant, flowing in its said tunnel, and divert it therefrom, a preliminary injunction will be granted, restraining the continuance of said diversion, even though an obedience to the injunction should render it necessary for defendants to build a bulkhead, or dam, across the tunnel.

[Cited in Portland v. Oregonian Ry. Co., 6 Fed. 324; Hatch v. Wallamet Iron Bridge Co., Id. 338. Distinguished in Mutual Union Tel. Co. v. Chicago, 16 Fed. 313.]

In equity. Application for preliminary injunction heard on bill and affidavits. Complainant is a corporation, organized for the purpose of mining for silver. Its grantors took up a ledge supposed to contain silver ores, situate on the side of the mountain, above Virginia City. Complainant excavated a tunnel, commencing in a ravine some distance below the croppings of its ledge, on the surface of the mountain, and extended it into the mountain to and through its ledge at a considerable depth below the surface. In excavating the tunnel, complainant struck a seam in the rock, from which flowed a stream of water, which it claimed, and appropriated, in accordance with the custom in force. The water so discovered and appropriated, the complainant leased to the Virginia and Gold Hill Water Company, a corporation organized to supply water to Virginia City and Gold Hill, one of the defendants, upon certain designated terms. Said water company paid the stipulated rents, and enjoyed the water under said lease for the

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

by him and unknown to him, the instruction of the court was right.

The case relied upon by the district attorney, to sustain his objection to the verdict, seems to me to be all sufficient to support it. It is the case of Com. v. Gillespie, 7 Serg. & R. 469. It was an indictment for selling lottery tickets, not authorised by the laws of the commonwealth. The opinion of the supreme court of Pennsylvania, delivered by Judge Duncan, on the point we are considering, is found in page 477. He says: "The evidence was, that a lottery office was kept in a house rented by Gillespie in this city, for several years, under a sign in the name of Gillespie's lottery office; that Gregory, a young lad, acted as his servant or agent in that office, and sold the ticket produced in evidence, a New York literature lottery ticket, and endorsed in the name of Gillespie; a lottery not authorised by the laws of the commonwealth; that Gillespie occasionally visited Philadelphia. I did not instruct the jury," said Judge Duncan, "that Gillespie was criminally answerable for the act of his agent or servant, but I left them to decide whether, from the whole body of the evidence, Gillespie was concerned in the sale of the ticket." The judge, after stating the evidence, continues: "These were circumstances from which the jury might infer his participation in the sale of the ticket." The judge afterwards proceeds: "If they found he had not participated in the transaction, they were instructed to acquit him." In my charge to the jury I directed them, that the defendant was not liable for the acts of the agent, unless he had some agency in or knowledge of them; which is certainly not so strong as the language of Judge Duncan, that the jury must acquit unless they found the defendant "had participated in the transaction."

On general principles of responsibility of one for the acts of another, the defendant cannot be answerable, penally or even civilly, for acts not done by his direction, by his authority, with his knowledge, or within the scope of his authority. In the case of Parsons v. Armor, 3 Pet. [28 U. S.] 428, referred to by the district attorney, it is said that "the general rule is, that a principal is bound by the acts of his agent no further than he authorises that agent to bind him." It is truly added that "the extent of the power given to an agent is deducible as well from facts as from express delegation." In Paley's work on Agency (page 226): "The responsibility of the master for the servant's negligence, or unlawful acts, is limited to cases properly within the scope of his employment." This is the rule as to a civil liability, and the case given is that of an action brought against the owners of a ship for goods lost by the carelessness of the master: there, judgment was given for the defendant, because it did not appear that the ship was actually employed to carry goods for him, for Lord Hardwicke remarked that

"no man could say that the master, by taking in goods of his own head, could make his owners liable." It is no doubt true, as stated by Paley, that "if a man employ an agent in the commission of a fraud, he is clearly liable for it himself, as if a goldsmith, by his servant, puts off counterfeit plate, or a taverner corrupts wine." It is added, that "employers are also civilly liable for frauds committed by their agents, without their authority, if done in their employment;" but by that I understand. not merely that the agent was employed by the principal for some purposes, but in the business in the prosecution of which the fraud was committed. If I employ one as a house servant, and he commits a fraud by forging my name, I am not liable for it. The agency must have some relation with the subject of the fraud. The utmost length to which any of the cases have carried the responsibility of a principal for his agent, is to compel him to make satisfaction civilly for an injury done to an innocent person, by the fraud or misconduct of the agent acting by his authority or in his employment. It is very clear, that this principle does not reach the case of a suit for a penalty under an act of congress. or under the circumstances which have been given in evidence in the case in question. If the defendant kept a commission store, the person who purchased and removed the casks was his clerk; and not employed by him, as far as we know from the evidence, to purchase casks or any thing else for him, much less to do so in violation of the act of congress. There was no error in the court's instruction to the jury, that the penalty could not be visited upon the defendant, unless he had some agency in the illegal transaction, or some knowledge of it. The offender against the law, was the person who purchased and removed the casks, without having the marks and numbers first defaced and obliterated according to the provisions of the act of congress; and he must answer for the offence who alone was guilty of it.

This is sufficient to decide the motion for a new trial, but it may be well to notice another matter that has been set up in the defence, for the purpose of correcting the error on which it is founded. We have seen that the suit was brought on the forty-fourth section of the act of March 2, 1799. It seems to have been the opinion of the defendant, that the provisions above alluded to, ordering that the marks and numbers on the casks shall be defaced and obliterated, are superseded and repealed, by the act of April 20, 1818; "providing for the deposit of wines and distilled spirits in public warehouses;" because it is enacted by the act. "that no drawback shall be allowed of the duties paid on any wines or spirits, unless such wines or spirits shall have been deposited in public or other stores, under the provisions of this act, and there kept, from their landing to their shipment." A constructive repeal of the former provisions is asserted, on the argument that the directions

for obliterating the marks were made, only to prevent frauds in obtaining drawback on wines and spirits not imported, but put into casks in which wines or spirits had been imported, and having the custom house marks and numbers as evidence of such importation. It is altogether a mistake. The provisions of the act of March 2, 1799, are in full force. There is no direct repeal of them, and an argumentative repeal must be much stronger than that now urged, before it should receive any attention. It is plain that other objects may have been in view, other frauds intended to be prevented, by directing the obliterations of the custom house marks from casks which have been emptied of their imported contents, besides the protection of the revenue against fraudulent claims of drawback.

It is not necessary to be more explicit upon so plain a point; but as the error is probably not confined to the defendant, I have thought it expedient to take this occasion to correct it.

The motion for a new trial is refused.

[NOTE. Subsequently, at the trial of another of these cases, Judge HOPKINSON charged the jury that the duty of obliterating these marks was upon the seller of the casks, and not upon the buyer. Under this instruction the jury found a special verdict, upon which judgment was entered for the defendant. Case No. 15,277; affirmed by circuit court. Id. 15,278.]